# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| BULLION MONARCH MINING, INC., ) | 3:08-CV-0227-ECR (VPC) |
| Plaintiff, ) | |
| ) | **ORDER** |
| vs. ) | |
| ) | |
| NEWMONT USA LIMITED, ) | |
| ) | |
| Defendant. ) | |

Before the court is Bullion Monarch Mining, Inc.'s ("Bullion") emergency motion for sanctions and for order compelling production of documents claimed to be privileged (#243). Newmont USA Limited ("Newmont") filed an opposition (#254), and Bullion replied (#257).

## I. Procedural History[1]

Bullion brought this action against Newmont in April 2008 concerning a dispute over a 1979 agreement relating to certain mining interests (#1). Bullion asserts five claims for relief: (1) for declaratory judgment, seeking a ruling that Bullion is entitled to a royalty and/or compensation for mining activities and production from within the Area of Interest; (2) for breach of contract for Newmont's obligations under the 1979 agreement to pay Bullion royalties; (3) for breach of the covenant of good faith and fair dealing under the 1979 agreement; (4) for unjust enrichment; and (5), for an accounting for all royalties owed to Bullion for Newmont's mining activities in the Area of Interest. *Id.*

Newmont promptly filed both an answer and a motion for judgment on the pleadings, and in August 2008, this court issued its first scheduling order, which provided a discovery cut-off date of April 27, 2009, and further stated that no extensions would be granted, since the court was initially expanding the time for discovery from 180 days to 339 days (#17). The parties stipulated to delay the Rule 26(f)

---

[1] The court has reviewed the tape recordings of the hearings held September 21, 2009 (#147), October 5, 2009 (#152), May 20, 2010 (#242), and July 1, 2010 (#261).

conference until July 30, 2008, but Bullion would not agree to stay discovery further (#27-1; Declaration of Matthew Hippler). On October 3, 2008, the District Court ordered a thirty-day briefing schedule limited to the question of the court's jurisdiction over the case (#18), and on October 23, 2008, Bullion served its first set of written discovery on Newmont (#27-1). On November 3, 2008, Newmont moved for a stay of discovery, given the District Court's request for further briefing, which this court granted (#32). This court stayed discovery until issuance of the District Court's order on the pending motion and directed the parties to submit an amended discovery plan and scheduling order five days after entry of that order, and further admonished the parties that no further extensions would be granted. *Id.* On March 24, 2009, this court issued a discovery plan and scheduling order setting a deadline of September 1, 2009 for the close of discovery (#35); therefore, all parties were on notice in March 2009 that six months remained in which to complete all remaining discovery in this action. By Bullion's calculation, Newmont's discovery responses were due April 4, 2009 (#257). Prior to responding to discovery, Newmont requested Bullion enter into a confidentiality agreement, which the court approved (#39). On June 2, 2009, Newmont responded to document production requests by stating that it would do so on a "rolling basis," given the volume of documents to be produced (#257). During the summer of 2009, the parties engaged in deposition discovery, despite the absence of Newmont documents. *Id.*

In June 2009, Bullion filed a stipulated amended complaint to add Barrick Gold Corporation and Barrick Goldstrike Mines, Inc. ("Barrick") as defendants (#48), which precipitated Newmont's request for a case management conference to sort out how the parties would proceed with the newly added defendants (#58). After hearing and discussion as to how best to proceed, Bullion agreed to sever the Barrick defendants from this case, which the court approved (#118). This court allowed one final extension of the discovery plan and scheduling order setting the discovery cut-off at October 16, 2009, with dispositive motions to follow on November 17, 2009 (#122). The case had now been pending for approximately fourteen months.

**A.    Newmont's Response to Requests for Production of Documents**

As noted earlier, on June 2, 2009, Newmont responded to Bullion's request for production of documents. Newmont responded that documents would be produced "on a rolling basis" as Newmont

uncovered them (#148, p. 8; #152; #257)). Through the course of deposition discovery that ensued over the summer, Newmont's counsel repeatedly advised Bullion that because the documents were voluminous, they needed to be carefully reviewed and bates-stamped.

This discovery dispute came to a head on October 5, 2009 at a case management conference. Bullion's counsel told the court that as of October 1, 2009, Bullion had not received one document from Newmont (#152). Newmont's counsel responded that as of July 21, 2009, Bullion had propounded four requests for production of documents and three sets of interrogatories. *Id.* By July and August 2009, Newmont's attorneys had gathered in excess of 30,000 pages of documents, and they assigned six attorneys to review them for relevance *and privilege*. *Id.* The documents spanned thirty years and included in-house counsel and outside counsel communications, as well as communications with third parties. *Id.* Newmont's counsel advised that the documents had to be formatted and that it had assigned a team of six lawyers to work diligently to complete document production. *Id.*

What followed at the hearing was a discussion of discrete groups of documents, and each is addressed in turn.

### 1. Friday, October 2, 2009 Newmont Production

On Friday, October 2, 2009, one business day prior to the Monday, October 5, 2009 hearing, Newmont produced approximately 2,500 pages of documents, which Bullion reported were not responsive to its document production requests. For example, included in the production were Bullion's own filings with the Securities and Exchange Commission. *Id.* This was Newmont's first production since discovery re-commenced in April 2009. At this time, Newmont did not provide any privilege log.

### 2. Newmont's Belated Production of the "Leeville Mine" Documents Responsive to Interrogatory #9

As of October 5, 2009, Newmont had not produced documents concerning the Leeville mine that it had previously promised to deliver to Bullion. This action generally concerns Bullion's claims against Newmont for royalties owed to Bullion pursuant to the May 1979 Agreement, and the Agreement provides, in part, that Bullion would be paid royalties on production from the Leeville Mine and a one percent royalty on all production from mines in what is called the Area of Interest (#112). In June 2009,

- 3 -

Bullion propounded Interrogatory #9(c) to determine the annual gross smelter returns for each mineral recovered from each mine from December 1, 1991 through 2008 (#124, Ex. 5). Newmont answered on August 11, 2009, and disclosed that Newmont could not locate data for certain mines (#124, Ex. 6). Bullion later learned during depositions that Newmont had destroyed documents necessary for Newmont to calculate the amount of royalties allegedly owed to Bullion for the period 1993-1998, and it brought a motion for sanctions (#112). Newmont claimed the records were destroyed pursuant to its records retention policy, although deposition testimony suggests Newmont had no retention policy (#s 114, 124 & 143). Newmont offered to reconstruct the destroyed documents from other sources, but as of the September 21, 2009 case management hearing, Bullion had still not received the information about the Leeville Mine (#147).

At the October 5, 2009 hearing, Newmont advised it would produce the Leeville Mine documents to Bullion no later than Friday, October 9, 2009, exactly one week before the October 16, 2009 discovery cutoff (#152).

### 3. All Remaining Document Production Responses

As of October 5, 2009, Newmont had not produced documents responsive to Bullion's initial document requests. When asked when Newmont intended to produce the documents, counsel responded that they would be produced by October 14, 2009, two days before the close of discovery. *Id.*

The court pressed Newmont's counsel to explain the late production at the very end of the discovery period, and while he acknowledged the situation was not "ideal," he insisted that Newmont had been as diligent as possible in gathering and reviewing the documents. *Id.* Importantly, he also told the court *that the documents had been reviewed for privilege* and put in a format that could be produced to counsel. *Id.* Newmont's counsel then told the court that Newmont intended to produce approximately 3,000 documents. *Id.* In response, Bullion's counsel expressed legitimate concern that Bullion's two lawyers could not reasonably be expected to review 3,000 documents that a cadre of Newmont lawyers had spent months reviewing, take follow-up depositions, if allowed, and then file its own dispositive motion by the deadline of November 17, 2009. *Id.*

1    Faced with Newmont's late production of documents, re-creating and producing the destroyed
2 documents, completing depositions, and the close of discovery in eight days, the court expressed grave
3 concerns about the prejudice to Bullion. *Id.* The court noted that Bullion commenced its action in April
4 2008 and that the parties and counsel were not only aware for some time about the scope of potential
5 discovery but that the court had also repeatedly told counsel that it would not extend the discovery
6 deadline and only did so because it had no choice. The court characterized Newmont's production of
7 thousands of pages of documents at this late date as "document dumping." *Id.* Notwithstanding these
8 concerns, Bullion's counsel expressed the desire to press on under the current scheduling order, and the
9 court directed the parties to proceed as scheduled. *Id.* However, the court gave Bullion leave to raise
10 discovery issues after receipt and review of the documents and to take follow-up depositions of Messrs.
11 Saldivar and Roesch. *Id.*

12    On October 9, 2009, Bullion produced its privilege log to Newmont and requested Newmont do
13 the same. Newmont did not produce any privilege log and did not respond to the request (#243).

14    On or about the close of discovery, Newmont produced in excess of 32,000 pages of documents,
15 and it had still not produced any privilege log. *Id.*

16    **B.    Post-Discovery Disputes and Newmont's Privilege Log**

17    On November 17, 2009, Bullion filed one motion for summary judgment (#186) and Newmont
18 filed four motions (#s 182-185). Bullion also sought leave to depose Brian Iverson of Newmont in
19 connection with the late-produced documents, as review of the documents revealed that he was
20 responsible for production of many of the documents (#225). In addition, Bullion complained that
21 Newmont had improperly designated over 25,000 pages of documents as "confidential," including copies
22 of recorded documents, copies of pleadings from other lawsuits, newspaper articles, and even documents
23 Newmont had earlier produced. *Id.* Newmont took the position that once a document is designated
24 "confidential," it is the burden of the opposing party to challenge that classification, and it opposed
25 making Mr. Iverson available for his deposition on the ground that this was a belated attempt to re-open
26 discovery (#228).

1    On April 15, 2010, the court heard argument on these issues, and the court ordered Newmont to review the 25,000 pages of documents marked "confidential" and provide Bullion's counsel with an index of these documents no later than May 17, 2010 (#230). Given Newmont's late production of thousands of documents, the inability of Bullion's counsel to review the documents during the intensive summary judgment briefing schedule, and the agreement at the October 5, 2009 hearing that Bullion might need to re-depose certain Newmont witnesses, the court ordered the depositions of not only Messrs. Saldivar and Roesch but also Mr. Iverson. *Id.*

On May 7, 2010, Newmont filed an emergency motion for protective order to recover a letter containing attorney-client communications that was inadvertently disclosed (#231). At a May 20, 2010 hearing on the motion, the court granted Newmont's motion and ordered the letter returned (#242). It was at this hearing that Bullion brought to the court's attention that Newmont had never provided a privilege log.

Contrary to the court's understanding at the October 5, 2009 hearing that several lawyers for Newmont had spent July through early mid-October 2009 reviewing documents for relevance *and privilege*, Newmont discloses a different chronology in its opposition to the motion for sanctions (#254-1; Declaration of Matthew Hippler). According to Mr. Hippler, it was not until October 22, 2009 that Newmont's counsel assigned a paralegal to prepare the privilege log. *Id.* Instead, Newmont's lawyers devoted their time to preparation of four motions for summary judgment which were filed on November 17, 2009, as well as opposing Bullion's motion for summary judgment. *Id.* The briefing on the five dispositive motions was completed on December 17, 2009, followed by the holiday season. *Id.* After Newmont's lawyers returned from the holidays, the paralegal presumably worked alone in her task, and on March 1, 2010, the paralegal completed her work. *Id.* Newmont counsel then assigned an associate to review certain documents, but that task was delayed because the associate took family leave for four weeks. *Id.* At about this same time, Bullion objected to the designation of in excess of 25,000 pages of documents as "confidential." After being ordered to do so, Newmont's counsel turned his attention to these documents to discern exactly which documents warranted being designated "confidential." *Id.* This process took four weeks. *Id.*

Therefore, it was not until the court ordered Newmont, on May 20, 2010, to produce the privilege log no later than May 28, 2010 that Newmont's counsel turned his attention the privilege log. *Id.* More than a year after Bullion's initial document requests and seven months after the close of discovery, Newmont's attorneys reviewed the documents in preparation for the privilege log. They accomplished this task in eight days. *Id.* Newmont's privilege log is ninety-eight pages, consisting of 1,126 entries, totaling 9,662 pages of documents *Id.* Exhibit A; #254-1. After producing the privilege log, Newmont reviewed a "small sub-set of documents that were subject to a final review for privilege," and provided a supplemental privilege log on June 21, 2010. *Id.*

On June 1, 2010, after Bullion had completed its post-discovery depositions, Bullion received Newmont's privilege log (#243). This motion for sanctions followed.

## II. Discussion and Analysis

In *Burlington Northern & Sante Fe Ry. Co. v. U.S. Dist. Court for the Dist. of Mont.,* 408 F.3d 1142 (9th Cir. 2005), the Ninth Circuit considered whether the defendant waived its privilege objections by failing to provide a privilege log at the time it served its discovery responses. The court reviewed Fed. R. Civ. P. 26(b)(5), which requires a responding party to expressly make a claim of privilege and describe the documents covered by the privilege, in conjunction with Fed. R. Civ. P. 34, which requires that written responses to discovery requests be served within thirty days of service of the request. The court rejected a bright line test for waiver of the privilege, and instead adopted what it characterized as a "holistic reasonableness test" to avoid needless expense and time, but also to punish "tactical manipulation of the rules and the discovery process." *Id.* at 1149. The court stated:

> We hold that boilerplate objections or blanket refusals inserted into a response to a Rule 34 request for production are insufficient to assert a privilege. However, we also reject a *per se* waiver rule that deems a privilege waived if a privilege log is not produced within Rule 34's 30-day time limit. Instead, using the 30-day period as a default guideline, a district court should make a case-by-case determination, taking into account the following factors: [1] the degree to which the objection or assertion of the privilege enables the litigant seeking discovery and the court to evaluate whether each of the withheld documents is privileged (where providing particulars typically contained in a privilege log is presumptively sufficient and boilerplate objections are presumptively insufficient); [2] the timeliness of the objection and the accompanying information about the withheld documents (where service within 30 days,

- 7 -

>       as a default guideline, is sufficient); [3] the magnitude of the document
>       production; and [4] other particular circumstances of the litigation that
>       make responding to discovery unusually easy (such as, here, the fact that
>       many of the same documents wee the subject of discovery in an earlier
>       action) or unusually hard. These factors should be applied in the context
>       of a holistic reasonableness analysis, intended to forestall needless waste
>       of time and resources, as well as tactical manipulation of the rules and the
>       discovery process. They should not be applied in a mechanistic
>       determination of whether the information is provided in a particular
>       format. Finally, the application of these factors shall be subject to
>       applicable local rules, agreements or stipulations among the litigants, and
>       discovery or protective orders.

*Id.* The court now considers the *Burlington* factors to decide whether, under the facts of this case, Newmont waived the attorney-client privilege as to the documents identified in its privilege log.[2]

> **A.    "The degree to which the objection or assertion of privilege enables the litigant seeking discovery and the court to evaluate whether each of the withheld documents is privileged"**

The first *Burlington* factor hinges on the other party's ability to assess the applicability of the privilege or protection. *Burlington Northern*, 408 F.3d at 1147 (citing Fed. R. Civ. P. 26(b)(5)). "The absence of explicit guidance as to the nature of the required notice enlarges the vacuum in which strategic manipulation of the discovery process by means of blanket assertions of privilege, or functionally silent privilege claims, may flourish." *Id.* at 848. A document-by-document showing of the applicability of the asserted privilege is not necessary, but the detail offered cannot be so minimal as to prevent the court and the receiving party from evaluating the privilege claim.

Bullion does not specifically argue that Newmont's log fails to provide sufficient information regarding the items listed in the privilege log (#243). However, Bullion does note that the mere volume of documents identified as privileged gives rise to Newmont's apparent blanket use of privilege. *Id.* Although Bullion's argument that the sheer volume of privileged documents raises doubts as to the entitlement of protection, the court cannot definitively say that Newmont's assertion of privilege with

---

[2]The parties cite several case that apply the *Burlington* factors. *See, e.g., Coalition for a Sustainable Delta v. Koch,* 2009 WL 3378974, at *4-5 (E.D. Cal 2009); *Carl Zeiss Vision Intern. Gmbh v. Signet Armorlite, Inc.,* 2009 WL 4642388, *3-4 (S.D. Cal. 2009); *Hoot Wine, LLC v. RSM McGladrey Financial Process Outsourcing, LLC,* 2009 WL 3857425, 4 (S.D. Cal. 2009); *Truck Stop.Net, LLC v. Sprint Communications Co., LP,* 2008 WL 2357008, 2 (D. Idaho 2008); *Burch v. Regents of University of Val.,* 2005 WL 6377313, 3 (E.D. Cal. 2005). While these cases are instructive, the *Burlington* court's admonition is clear that district courts are to analyze the facts on a case-by-case basis, which is of paramount importance.

respect to each document precludes Bullion and the court from evaluating whether each document is privileged. This factor tips slightly in favor of Newmont.

**B.    "The timeliness of the objection and accompanying information about the withheld documents (where service within 30 days, as a default guideline, is sufficient)"**

It is undisputed that this case involves many thousands of documents and that it took Newmont time to collect documents, to review them, to cull out those documents that were unresponsive, and to prepare a privilege log. It is also undisputed that Bullion recognized that its document production requests would entail significant time and effort to produce, which is presumably why Bullion did not initially object when Newmont promised document production back in June 2009 (one year ago) "on a rolling basis." However, as the discovery cut-off loomed, Newmont had produced no documents, much less a privilege log. Newmont's counsel represented to the court and Bullion at the October 5, 2009 hearing that six lawyers had devoted many hours to review of the documents for relevance *and privilege*. Apparently, this was incorrect, because Newmont later explained that after completing the late document production in October, its counsel devoted their time to preparation of four dispositive motions. The holidays intervened, and it was only after January 2010 that Newmont assigned *one paralegal* to prepare the privilege log. The associate assigned to oversee privilege log questions was on family leave for four weeks, so no more work was done until he returned.

Seven months after the close of discovery, the court learned that Newmont had never produced a privilege log. The court ordered it to do so, and Newmont managed to produce the log in eight days (#s 242 & 243).[3] As noted in *Burlington*, the thirty-day default for responses acts as a guideline, and courts are encouraged to view timeliness in relation to the other factors involved. *Compare Carl Zeiss Vision Int'l GmbH v. Signet Armorlite*, 2009 U.S. Dist. LEXIS 111877, at *14 (S.D. Cal. Dec. 1, 2009) (nine month delay in production of privilege log deemed unreasonable); *with Coalition for a Sustainable*

---

[3] Newmont contends that this court implicitly determined that Newmont had not waived the attorney-client privilege at the May 20, 2010 hearing, because the court ordered Newmont to produce the log. The court did no such thing. Ironically, the May 20, 2010 hearing concerned Newmont's inadvertent disclosure of a document it deemed privileged, and it asked the court to order Bullion to return it, which the court did. However, to extrapolate from that hearing that this court somehow issued any ruling concerning Newmont's privilege log is illogical and incorrect.

- 9 -

*Delta v. Koch*, 2009 U.S. Dist. LEXIS 100728, at *11-14 (E.D. Cal. Oct. 15, 2009) (in a case dealing with a universe of 80,000 documents and thousands of emails, defendants' assertion of privilege two months after production of documents was reasonable).

Here, Newmont's gross untimeliness in production completely nullifies Bullion's ability to meaningfully engage in that inquiry. Admittedly, the District Court has granted Bullion's motion for additional briefing to supplement dispositive motions (#263), but what are Bullion's options insofar as the privilege log is concerned?[4] At the July 1, 2010 hearing, the court posed this question to Newmont's counsel, who replied that it was up to Bullion's counsel to review the privilege log, decide which among the 1,126 entries it contests, identify new witnesses it would like to depose (which were never identified until Newmont produced the privilege log), re-depose certain other witnesses, and then file a more targeted motion for sanctions, if necessary. The court presumes that it, in turn, would be required to review disputed privilege log entries *in camera* to decide what is privileged. This takes time, and there is no time left. Had the log been produced in October 2009, or even in January 2010, Newmont's suggestion might be realistic, but not now. The District Court has given Bullion until August 30, 2010 to supplement its opposition to four motions for summary judgment (#263).

Given the production of the privilege log at least one year after Bullion's requests for production and seven months after the close of discovery, the court finds that this factor weighs in favor of Bullion and against Newmont.

**C.    "The magnitude of the document production"**

As noted, there is no dispute that this is a document-intensive case and required extraordinary efforts to obtain documents from various departments at Newmont, as well as from outside counsel. What is absent here is any effort by Newmont to communicate with Bullion about the status of the privilege log, or to seek assistance from the court to establish a realistic time frame to produce the privilege log – either in stages or all at once. At nearly every hearing, Newmont's counsel explained that the documents at issue were voluminous, that six or more lawyers in various branches of the law firm

---

[4]The District Court issued the order allowing the parties to supplement their dispositive motions after the July 1, 2010 hearing.

- 10 -

were working feverishly to complete document review for relevance *and privilege,* and that Newmont was doing as much as it could to complete document production.  Newmont's counsel knew this would daunting task given the number of potentially privileged documents at issue.  Notwithstanding the volume of documents, the court also repeatedly admonished counsel that it would not extend discovery.  Newmont well knew that prompt document review and production of the documents and the log was of utmost importance and failed to take steps to insure that the privilege log would be produced until well past the time it could be of use to Bullion.

Based on the facts of this case, this factor weighs in favor of Bullion.

**D.   "Particular circumstances of the litigation that make responding to discovery unusually easy or unusually hard"**

Like the defendant in *Burlington,* Newmont is a very sophisticated corporate litigant who is a "repeat player" in mining litigation, and Newmont and Bullion have been adversaries in prior litigation.  Newmont's counsel acknowledged from the outset that this case is complex, document-intensive, and required the resources of several lawyers to complete document production.  However, this was not unchartered territory for Newmont counsel.  If at any time Newmont grew concerned that it simply could not complete the privilege log in light of the dispositive motion deadline, it could have done as the *Burlington* court suggested, and either worked out an agreement with Bullion, or asked the court for guidance.[5]  It did neither.  In addition, Bullion notes that certain documents marked as privileged have been used as deposition exhibits.  *See Burlington Northern*, 408 F.3d at 1149 (noting that where documents have been produced in prior litigation, the producing party should not be troubled in producing those same documents).

Therefore, this factor weighs in favor of Bullion and against Newmont.

---

[5] The court also observes that over the course of this litigation, Newmont has not hesitated to rely on the court's orders or discovery rules to obtain a desired result.  For example, the court approved a confidentiality order, and Newmont then relied on it to designate over 25,000 documents as confidential, and then argued it was Bullion's burden to challenge the designations, even though many documents were quite obviously not confidential (#230).  When Newmont inadvertently disclosed an attorney-client communication, it sought emergency relief from the court and got it; the court ordered the documents returned, even though Newmont had not yet provided Bullion with a privilege log (#243).  During written discovery, Newmont interposed objections to Bullion's discovery requests, claiming that terms such as "Newmont," "parties," "Joint Venture Agreement," "High Desert," and "given copies" were vague and ambiguous (#124-2).

### E. Conclusion under *Burlington* Factors

*Burlington* directs the court to apply these factors "in the context of a holistic, reasonable analysis, . . . to forestall needless waste of time and resources, as well as tactical manipulation of the rules and discovery process." *Id.* Viewing this matter from a broader, holistic perspective, the court finds that the factors strongly favor Bullion's position that Newmont has waived any asserted privilege.

The court has these comments. Newmont delayed production of the privilege log, rendering it useless for its intended purpose. There is no conceivable way that Bullion can review the 1,126 entries, compare them with deposition testimony of numerous witnesses, and review the thousands of documents produced to challenge the log entries, get a hearing and decision from the court, and then supplement its oppositions to dispositive motions, all by August 30, 2010. This does not even include the potential necessity to re-depose witnesses or depose new witnesses never disclosed. Some specific examples illustrate the problem.

Frank Erisman is Newmont's former outside counsel, and thirty-eight pages of the privilege log are from Mr. Erisman's law firm (#243-1, Ex. A). Mr. Erisman's communications with Bullion's former counsel, Garry McAllister, is of pivotal importance in this case. Newmont itself explains the importance of these communications:

> In July 1997, Newmont received a letter from Bullion Monarch Company's attorney, J. Garry McAllister,[6] requesting that Newmont provide certain reports relating to operations in the Leeville project pursuant to the May 10, 1979 agreement. *See* Declaration of R. Franklin Erisman, Esq., attached here as Exhibit 2. Newmont's outside counsel, R. Franklin Erisman, Esq., responded to Mr. McAllister's letter on July 31, 1997,[7] and explained that Newmont Gold Company was not obligated by the reporting provisions of the May 19, 1979 agreement because, as a result of, among other things, a default judgment entered against Bullion Monarch Company in 1993, Bullion Monarch Company no longer had any rights under the agreement except as contained in paragraph 4. *See* Erisman Declaration. Essentially, Mr. Erisman's letter indicated to Mr. McAllister that Newmont Gold Company did not have any obligation to report any of its mining activities to Bullion Monarch Company.

---

[6] *See* July 10, 1997 letter (#265).

[7] *See* July 31, 1997 letter (#265).

- 12 -

> Bullion alleges in its Motion that Mr. McAllister sent a letter dated August 21, 1997 to Newmont's counsel. Bullion has produced in this litigation two letters purportedly sent by Mr. McAllister to Mr. Erisman dated August 14, 1997 and August 21, 1997.[8] *See* Erisman Decl. at Ex.3; *see also* Brust Aff., at Ex. 3. Mr. McAllister's purported August 14, 1997 letter disputes Mr. Erisman's assertions concerning the applicability of the May 10, 1979 agreement, and in particular, it claims that the "area of interest" provision contained in that agreement is still in full force and effect. *See* Ex. 3 to Erisman Decl. Mr. McAllister's purported August 21, 1997 letter to Mr. Erisman claims that Mr. McAllister had a conversation with Mr. Erisman on August 20, 1997 during which they agreed that Newmont Gold Company is obligated by "area of interest," inspection, and reporting provisions contained in the May 10, 1979 agreement. *See* Ex. 3 to Brust Aff.
>
> Newmont denies that Mr. McAllister ever sent either of the two letters purportedly dated August 1997. Indeed, Mr. Erisman, the alleged recipient of those letters, nor his colleague James F. Cress, who also represented Newmont during that period of time, did not learn of either of the two purported letters from Mr. McAllister dated August 1997 until Newmont's current litigation counsel provided them copies of the letters in connection with this litigation. *See* Erisman Decl.; *see also* Declaration of James F. Cress, Esq., attached hereto as Exhibit 3. Further, Mr. Erisman does not recall ever having had a conversation with Mr. McAllister on or about August 20, 1997, during which he agreed that Newmont Gold Company was bound by the May 10, 1979 agreement, and in particular to the "area of interest," inspection, and reporting provisions contained in that agreement. *See* Erisman Decl. Mr. Erisman is certain that such a conversation did not occur. *See id.* As further evidence that Mr. Erisman did not receive the purported August 1997 letters, Mr. Erisman was unable, upon careful review, to locate any letter in his files from Mr. McAllister dated either August 14, 1997 or August 21, 1997. *See id.* For that matter, Mr. Erisman did not locate in his files any letter from Mr. McAllister dated after July 10, 1997. *See id.*
>
> Further, Mr. Ersiman and Mr. Cress searched their respective billing and time keeping entries for any notation concerning any time spent reviewing or discussing a letter from Mr. McAllister during the August 1997 timeframe. *See* Erisman Decl.; *see also* Cress Decl. Neither Mr. Erisman nor Mr. Cress have any such record. *See* Erisman Decl.; *see also* Cress Decl. Accordingly, Newmont's position is that it did not receive through its outside counsel either of the two August 1997 letters to Mr. Erisman, and Mr. Erisman and Mr.McAllister did not come to the agreement described in the purposed August 21, 1997 letter.

(#124, Newmont's opposition to motion for sanctions for destruction of evidence, page 5, lines 3-28; 6:1-18).

---

[8] *See* August 21, 1997 letter (#265).

- 13 -

At the July 1, 2010 hearing, Bullion provided the court with copies of the three letters, which are part of the court's record (#265). Bullion's counsel confirmed that Mr. Erisman had indeed testified at his deposition that Mr. McAllister's July 10, 1997 letter was not in his file, and although he read it, he must have reviewed it in Ms. Hansen's office, since he sent Mr. McAllister a letter in response on July 31, 1997. Bullion's counsel also confirmed that Mr. Erisman was adamant he had neither spoken with Mr. McAllister in August 1997, nor had he received any letters from him.

Mr. Erisman's deposition was recently taken in a companion case, *Bullion Monarch Mining, Inc. v. Barrick Goldstrike Mines, Inc.*, Case No. 3:09-CV-0612-ECR (VPC). After Mr. Erisman's deposition was concluded, Bullion received Newmont's fourteenth supplemental disclosure on or about June 22, 2010 (nine days before the July 1, 2010 hearing). The first five pages consist of a fax transmission with a cover sheet dated July 17, 1997. It is addressed to Mr. Erisman, and attached to the fax is Mr. McAllister's July 10, 1997 letter, which Mr. Erisman insisted he had never received and was not in his files (#265).

Bullion's counsel then turned the court's attention to Newmont's privilege log. One section is labeled "HRO," which stands for Mr. Erisman's law firm, Holme Roberts & Owen LLP. On page one, item seven of the HRO privilege log is the following entry:

| Main Date | To | From/Author | Type | Privilege Narrative |
|---|---|---|---|---|
| 31 Aug 97 | - | Erisman, R. Franklin, Esq. | Note | Attorney's handwritten notes regarding telephone conference with McAllister |

So, eleven days after the August 20, 1997 phone call from Mr. McAllister that Mr. Erisman testified he did not have, and ten days after the August 21, 1997 letter Mr. Erisman testified he did not receive, there is this entry. Had Bullion received Newmont's privilege log before either of these depositions, along with the fax cover sheet, Bullion would have been able to challenge Mr. Erisman's deposition testimony on a central factual issue in this case. Now, it is too late. The privilege log contains 621 entries for Mr. Erisman, and it is inconceivable that Bullion's counsel can review each entry, determine which to challenge, file a motion to resolve disputes, and supplement five dispositive briefs all before August 30, 2010 (#14).

In another example, Graham Clark, formerly vice-president and Newmont's in-house counsel, also appears prominently in the privilege log – 364 times. Newmont designated Mr. Clark to discuss several topics in this case because he was involved in the transactions by which Newmont acquired an interest in the mining properties, which are the subject of this action (#243). According to Bullion, Mr. Clark was involved in the 1993 litigation in which Newmont, Bullion, and High Desert were parties, and was involved in decisions concerning who should be named in that case and what issues should be raised. *Id.* In August 2009, Mr Clark was deposed, and he testified about a wide ranges of issues relevant to this case. *Id.* Now that Bullion has received the privilege log with 364 entries for Mr. Clark, it faces a similarly impossible task to evaluate whether documents are properly withheld or may lead to inconsistencies in his deposition testimony.

In addition, among the documents identified in Newmont's privilege log is a ten-page letter that has been used as a deposition exhibit for many months without any objection from Newmont. Whether the privilege log contains other documents that have been produced or should have been produced is unknown. Finally, the privilege log identifies for the first time several people with knowledge of the litigation who Newmont never disclosed as witnesses.

What is most disturbing, however, is that Newmont's counsel told the court at the October 5, 2009 hearing that as many as six lawyers had spent the summer reviewing the many thousands of documents for relevance and *privilege,* but now tells the court that it was not until January 2010 that the privilege log was assigned to a sole paralegal and an associate who was gone for four weeks. Both this court, and presumably Bullion's counsel, relied on those statements and anticipated that a privilege log would soon follow the document productions.

The question, then, is why didn't Bullion's counsel follow up on the privilege log and move to compel its production instead of raising it for the first time at the May 20, 2010 hearing? The answer is obvious. At the close of discovery, Bullion received over 30,000 pages of documents, and began review in anticipation of the looming dispositive motion deadline. On November 17, 2009, Newmont filed four separate motions for summary judgment, and Bullion filed one of its own. Next came the intensive briefing schedule to oppose four summary judgment motions, and then reply to Newmont's

opposition, all of which concluded on December 17, 2009.  Bullion continued document review after the holidays, took two depositions of Messrs. Saldivar and Roesch, and then came back to court to challenge Newmont's designation of 25,000 documents as confidential, and to obtain a court order to re-take Mr. Iverson's deposition.

The court's impression is that Newmont's counsel focused its litigation resources for its own benefit (such as preparing four motions for summary judgment), but abdicated its discovery obligations to Bullion, especially after the October 2009 document production.  Given the very late stage of these proceedings and the fact that no amount of post-privilege log discovery now can cure the prejudice Bullion has suffered, the court is left with little choice but to find that Newmont has waived its privilege as to every document designated in the privilege log, including those designated as protected under the work product doctrine.[9]

The court recognizes that preservation of the attorney-client privilege is among the most ardently protected in American jurisprudence, and it is with reluctance that the court issues this order; however, Newmont leaves the court no choice.

Based upon the foregoing,

IT IS HEREBY ORDERED AS FOLLOWS:

1. Bullion's emergency motion for sanctions and for order compelling production of documents claimed to be privileged (#243) is **GRANTED;**

2. Newmont shall produce all documents identified in its privilege log to Bullion's counsel no later than **5:00 p.m. Pacific Time on July 30, 2010**;

3. If requested, this court will not issue a stay of this order pending further proceedings, given the District Court's deadlines for filling supplemental points and authorities on dispositive motions; and

---

[9] Bullion contends that documents are improperly designated as protected by the work product doctrine because Newmont repeatedly claimed in deposition testimony and in motions before the court that Newmont never anticipated litigation with Bullion because all matters were resolved in the 1993 litigation (#243). Newmont did not respond to this claim in its opposition (#254) or during oral argument on July 1, 2010. Pursuant to Local Rule 7-2(d), Newmont's failure to oppose is deemed a waiver, and the relief Bullion requests will be granted.

4. Should a party seek a stay of this order, it shall apply for a stay to the District Court.

**IT IS SO ORDERED.**

Dated July 23, 2010.

_____
UNITED STATES MAGISTRATE JUDGE